[Civ. No. 945.   Third Appellate District.—May 7, 1912.]

E. W. NEWHALL, GEORGE A. NEWHALL, and ALMER M. NEWHALL, Copartners Under Firm Name of H. M. NEWHALL & CO., Appellants, v. JOSEPH LEVY BAG COMPANY, a Corporation, Respondent.

CORPORATIONS—MERCANTILE BUSINESS—RESOLUTION OF DIRECTORS NOT ESSENTIAL—ASSENT OF OFFICERS—EVASION NOT TOLERATED.—Since a very large part of the commercial business of the country is, as a matter of convenience, if not of necessity, carried on by corporate organizations, it would greatly hamper their usefulness if all their current purchases of merchandise could be made only by resolution of its directors, or if the public dealing with their officers would be at the peril of having their contracts repudiated when unfavorable to the corporation, or less profitable than was anticipated. Where a contract made in the name of a corporation, with the assent of its officers, for merchandise to be imported from abroad, is sought to be repudiated, because not voted for by resolution of its directors, it is held that a system of law that would tolerate such an evasion of responsibility would be unworthy of a civilized world.

ID.—PURCHASE OF IMPORTED BAGS—BREACH OF PRIOR CONTRACT—SETTLEMENT—NEW CONTRACT — ASSENT OF DIRECTORS — ESTOPPEL.—Where, in 1907, a valid contract was made by defendant corporation to purchase one thousand bales of bags, imported by plaintiffs, and delivered in June or July, 1908, which defendant could not pay for, to plaintiffs' damage in $12,000, whereupon it was agreed between them that defendant should pay $7,000, to cover carrying charges thereon, and that the contract should be rescinded as to the remaining damages, in consideration that defendant should execute a new contract, for the purchase of a like number of new bales of bags for delivery in June or July, 1909, which new contract was assented to by its directors, but was executed August 3, 1908, in the name of the corporation by its secretary, and, in compliance therewith, new bales of bags were imported by plaintiffs at large expense, it is held that defendant is estopped from repudiating the new contract because signed only by its secretary.

ID.—GENERAL RULE AS TO ESTOPPEL—PRINCIPAL AND AGENT—FRUITS OF UNAUTHORIZED CONTRACT—APPLICABILITY TO CORPORATIONS.—It is a general rule of estoppel, recognized by the authorities, that where, with full knowledge of all the facts involved, a principal reaps the fruits of the unauthorized contract of his agent, and for some time acquiesces in its provisions, he will be deemed to have ratified it, and will be estopped from repudiating it to the injury of the latter; and this doctrine applies to corporations equally with individuals.

ID.—ERRORS OF TRIAL COURT—CONCEPTION OF LAW—REFUSAL OF EVIDENCE—NONSUIT—REFUSING AMENDED COMPLAINT.—It is held that

the judge of the court below tried the case on an erroneous conception of the law applicable to the facts appearing; that he improperly refused much evidence which should have been admitted; that the court erred in granting a nonsuit for insufficient proof of the execution of the contract of August 3, 1908; and in refusing to allow the plaintiff to plead the facts relative to the contracts of 1907 and 1908, in an amended complaint.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial. George A. Sturtevant, Judge.

The facts are stated in the opinion of the court.

Thomas H. Breeze, Gordon Hall, and Albert Fink, for Appellants.

Otto Irving Wise, for Respondent.

CHIPMAN, P. J.—Plaintiffs allege in their complaint that on August 3, 1908, defendant "made, executed and entered into a certain contract in writing with said plaintiffs, which said contract was in words and figures as follows:

" 'BAG CONTRACT.
" 'August 3/08.
" 'For and in consideration of one dollar in hand paid, the receipt whereof is hereby acknowledged, we hereby purchase from H. M. Newhall & Co. one thousand (1000) bales (each bale 1000 bags) 36x22-12 oz. Standard Calcutta grain bags: To be delivered in good order and condition at San Francisco, California, ex steamer and/or ship and/or warehouse at seller's option.

" 'Time of delivery buyer's option during June/July, 1909. (Bags to be importation of 1908/1909.)

" 'Price 7⅛ c net each bag, duty paid. Payable at San Francisco, California, as delivered, in U. S. gold coin.

" 'This sale is based on the present customs tariff, viz.: Seven-eighths of one cent per pound and fifteen per centum ad valorem. Any change to be for account of the purchaser.
" 'JOSEPH LEVY BAG CO.,
" 'Buyers.
" 'SAM J. OPPENHEIM,
" 'Secretary.' "

That plaintiffs thereafter purchased the bags called for in said contract, "and held the same subject to defendant's order during the month of June and July, 1909"; that at no time during said months or at any time did defendant request delivery of said bags, or any of them; that on July 31, 1909, plaintiffs tendered to defendant said bags, and defendant "then and there wholly refused said tender and refused to accept delivery of said bags or any of them, and wholly refused to pay the price in and by said contract reserved for said bags, or any price whatsoever"; that thereafter, to wit, on August 3, 1909, plaintiffs sold said bags for the best obtainable price, to wit, five and one-fourth cents per bag, and on said day "made demand on defendant for the payment of the difference between the contract price for the purchase of said bags and the selling price thereof, to wit, the sum of eighteen thousand seven hundred and fifty dollars"; that defendant refused and still refuses to pay said sum, and the same and the whole thereof is unpaid. Judgment is prayed for said sum with interest from August 1, 1909.

A general and special demurrer was overruled, and defendant answered, specifically denying the averments of the complaint.

At the close of plaintiffs' evidence they were denied leave to file an amended complaint, and defendant's motion for a nonsuit was granted and judgment was entered for defendant. Plaintiffs moved for a new trial, which was denied. The appeal is from the judgment and order on bill of exceptions.

It is somewhat difficult to extract from the record the precise state of the evidence on which the nonsuit was granted. Plaintiffs opened the case by calling witness Mills, a bag broker who had business relations with defendant, and offered to prove by him a contract, entered into by defendant, August 12, 1907, with plaintiffs, which is in all respects the same as the contract sued upon except that it called for the delivery of the bags "during June-July, 1908," and was signed by the secretary and president of the corporation and attested by its seal and is marked "Exhibit I"; whereas the contract set out in the complaint called for delivery of the bags "during June-July, 1909," and was signed "Joseph Levy Bag Co., Buyers, Sam J. Oppenheim, Secretary." It was conceded that this latter contract was required, by the statute of frauds,

to be in writing. The following statement by one of plaintiffs' attorneys will give a key to the controversy and will contribute to a better understanding of the rulings on the evidence and of the final order of nonsuit:

"Mr. Breeze: I assume the defense will be failure of authority to execute the contract set forth in the complaint. If your honor please, the making of this contract is denied. We propose to show that they received benefits under this contract. We propose to show they acquiesced in the making of this contract by the secretary. In the year 1907 the Joseph Levy Bag Company and the firm of H. M. Newhall and Company entered into a contract for the purchase of bags for June and July delivery in the year 1908, at the rate of seven and one-eighth cents per bag; the contract being for one thousand bales. That original contract was signed Joseph Levy Bag Company by Charles Levy, as president, and Samuel J. Oppenheim as secretary, and was under the corporate seal. In June and July of the following year the price of bags had fallen and the Joseph Levy Bag Company was unable to accept under that contract. They went to Newhall and Company and entered into an agreement whereby they agreed to pay $5,000 and give their promissory note for $2,000, it being understood that Newhall and Company would waive their claim for damages for breach of that contract at that time—

"The Court: That has not the least bit of bearing on this writing before me. (Contract sued on.)

"Mr. Breeze: I desire to show the authority to enter into this contract. These people have received the benefit of it.

"The Court: What have they received—the sacks?

"Mr. Breeze: They received a remission of the damages accrued by reason of breach of the former contract. I presume I may show authority by proving ostensible agency, by proving ratification, by proving acquiescence and by proving estoppel in pais; that they received a valuable consideration for entering into this contract which they have retained. My proposition is that this contract was part of a prior transaction. It was given in consideration of the rescission of an old contract upon which they had sustained damages for something like $18,000. They settled that contract—that controversy—by paying $5,000 in cash and giving their promissory

note and also the contract was renewed for the following year
at the same price.

"The Court: That does not help me a bit. We want to
get at this man's authority to sign this contract" (the con-
tract sued on).

Thereupon, Edwin A. Newhall, one of the plaintiffs, was
called as a witness on their behalf. He testified that his firm
had business dealings with defendant in August, 1908, and
when asked "the nature of that transaction," defendant ob-
jected on the ground that "those transactions were merged in
the written contract and the written contract is the best evi-
dence." The objection was sustained. His attention was
called to the contract of August 3, 1908, set out in the com-
plaint, and he testified to the signature of Oppenheim. This
contract was offered in evidence and is designated as "Exhibit
II," the court remarking: "It is not admitted just now. We
pass on." The witness stated that he had negotiations with
Joseph Levy Bag Company prior to the receipt of this con-
tract, but he was not permitted to state anything relating to
such negotiations, nor was he permitted to state that plain-
tiffs took steps to enable them to deliver the bags. Counsel
suggested that he could not put in his entire case at once.

"The Court: I realize the proposition that you have just
stated, but I think in this case I will call for proof of this con-
tract first.

"Mr. Breeze: I will have to prove that contract by acqui-
escence and estoppel.

"The Court: Go ahead and prove it by acquiescence and
estoppel, but I can't see how you can prove it in such a way."

The witness was permitted to testify that he had conversa-
tions with some of the officers and directors of the bag com-
pany in regard to this contract at which at least three of the
five directors, including the president and secretary, were
present, and also some other members of plaintiff company,
but he was not permitted to testify to anything that occurred
at those meetings. In reply to counsel that he proposed by
the witness "to show an acquiescence in this contract"; that
the directors of the corporation knew of the contract "and
did not deny execution of it until the following year, when
the bag market took a drop," the court said: "I do not under-
stand that that makes any difference to me." Counsel then

stated to the court more fully his view of the matter as follows:

"Mr. Breeze: They are estopped from denying authority unless they put us in the position which we were in at the time the breach of the original contract occurred. In June, 1908, they were in default in the fulfillment of the contract which matured on that date. They arranged with Newhall and Company to remit damages and the damages were remitted under an agreement by which we were paid a certain sum in lieu of the carrying charges on those bags during the year. They were to give a new contract which was in effect an extension of the old contract for a year more. They received a benefit or a valuable consideration for entering into this contract, namely the remission of those damages. There was a valuable consideration paid by Newhall and Company for the execution of this contract.

"The Court: You have not asked any questions to show that, Mr. Breeze.

"Mr. Breeze: I did, I propose to show it by this witness.

"The Court: Go on and question him about it."

Counsel then proceeded to put questions to the witness in various forms in his effort to show the history of the transaction as he claimed it to be; the circumstances surrounding the parties; that plaintiffs' dealings with Oppenheim were with him as secretary of defendant corporation; what representations he made when he brought the contract to plaintiffs; the consideration for its execution; that plaintiffs' negotiations had been with at least three of the directors assuming to act for the defendant; that the president and secretary of the defendant corporation were present at the delivery of the contract, but the court sustained objection to all such questions. Notwithstanding these and subsequent rulings, most of the essential facts in the transaction came out without objection, as is hereinafter shown.

It appeared that defendant was engaged in the business of "buying and selling bags, burlap and twine," and it was admitted that Oppenheim was a director and secretary of the corporation. It was also admitted that Elias, Charles and William Levy were directors of the corporation "and participated with him (Oppenheim) in the conduct of the affairs of the corporation." Plaintiffs offered to prove that these

four persons owned an equal number of shares in the cor-
poration, ''the fifth director holding only one share of qualify-
ing stock, so that it was in effect a copartnership conducted in
the form of a corporation for convenience,'' but all such evi-
dence was denied.

When on the witness-stand, Oppenheim was asked whether
the Levys above named knew that he was ''going to take this
contract up and deliver it to plaintiffs''; also ''what knowl-
edge, if any, your associates, Messrs. Levy that I have named,
had of the contract which you say you delivered on the 3d
of August, 1908''; also, whether or not he was directed by his
associates to deliver the contract; also, whether he or his
associates, after the delivery of this contract, disaffirmed ''the
same or in any way notified the plaintiffs that it was unau-
thorized and not a corporate act.'' Objections to these ques-
tions as irrelevant, incompetent and immaterial, and not
within the issues, were sustained.

The deposition of William L. Martin was admitted in evi-
dence and, except as noted, without objection. He testified as
follows:

''I reside in San Francisco. I am manager of the bag de-
partment of H. M. Newhall and Company. I have been en-
gaged in that occupation twenty-one years. I was manager
of that department during the years 1907–08–09. I know the
defendant Joseph Levy Bag Company. I know Mr. Charles
Levy. He is president of the defendant corporation. I know
Samuel J. Oppenheim. He is the secretary of the defendant
corporation. I have met one of the other directors. I am
not sure whether he is named Elias or William. It is either
one or the other. I recognize a paper which is shown me
marked 'Copy Bag Contract' under date of August 12, 1907.
It purports to be a contract for the sale of one thousand bags,
Calcutta grain bags, to Joseph Levy Bag Company. I have
seen the original of the paper of which this purports to be a
copy. (The paper identified by witness is a copy of plaintiffs'
exhibit I.) I saw it on file in our office. It was returned to
the Joseph Levy Bag Company. This is a correct copy of the
original except that the original had Charles Levy's signature
as president and Samuel J. Oppenheim's as secretary. The
corporate seal was attached to it. I know it to be a correct

copy of the original. I have made personal comparison of it with the original."

The contract of August 12, 1907, was offered in evidence, the court reserving its ruling, after objection.

"The Witness (continuing) : On or about the end of July, 1908, I had a conversation with Mr. Charles Levy, Mr. Oppenheim and either Elias or William Levy in regard to business transactions between the firm of H. M. Newhall and Company and Joseph Levy Bag Company. The conversation was about the delivery of the bags and the Joseph Levy Bag Company taking them up and paying for them. They said they were short of funds and could not pay for the bags and were willing to continue the contract for another year. Q. That is the Joseph Levy Bag Company? A. Yes, sir. After a great deal of discussion we decided to renew the contract for another year provided they paid carrying over charges. Q. Did they make such payment? A. They did. They paid in all $7,000, of which $2,000 was in shape of a promissory note and $5,000 in cash. While these negotiations were pending we had four conversations at least, probably more. The terms of the proposed agreement were discussed in the presence of all three gentlemen I have mentioned. As a result of these negotiations we entered into a further contract for the sale of bags. I recognize a typewritten document shown me on the letter heading of H. M. Newhall and Company, dated August 3, 1908, marked 'Bag Contract.' It is a copy of the contract which was signed August 3, 1908. (The paper identified by witness is a copy of plaintiffs' exhibit II.) This is the contract to which I have referred in my previous testimony as being entered into as a result of these negotiations. The original I suppose is in our office. I have made search for it but so far have been unable to find it."

The contract of August 3, 1908, was then offered in evidence and after objection, the court reserved its ruling.

"The Witness (continuing) : After this contract was signed by Oppenheim on behalf of Joseph Levy Bag Company, no notice whatever was received from the Joseph Levy Bag Company or any officer or agent thereof, that Mr. Oppenheim had no authority to enter into the contract on behalf of Joseph Levy Bag Company."

Witness was asked whether plaintiffs procured the sacks necessary to fill the contract; what plaintiffs did in reference to the contract after its date; whether plaintiffs had bags on hand to fill the contract during July and August; whether plaintiffs communicated with defendant in regard to the contract during July and August, 1908.   To all these questions objection was sustained.   Also a letter written by plaintiffs and sent to defendant on July 27, 1909, informing defendant that plaintiffs were prepared to deliver the one thousand bales of bags mentioned in the contract of August 3, 1908; and the reply of defendant, of July 29, 1909, denying the execution of the contract; also letter of plaintiffs informing defendant that they would at once proceed to dispose of the bags and would hold defendant responsible for any loss under the contract; also letter of August 2, 1909, advising defendant that the best bid received for the bags was five and one-fourth cents and that they proposed to close out the transaction on that basis, holding defendant for the difference.   All these letters were objected to and the objections sustained.   As also all subsequent questions to show what plaintiffs did with the bags, the prevailing demand and price, and like matters.

''The Witness (continuing) : At the termination of the year following the making of the contract of 1907, Charles Levy said that Joseph Levy Bag Company had not money to take up the bags.   We agreed to cancel the first contract upon certain conditions.   We determined the amount that should be paid for the cancellation of that contract by ascertaining the approximate carrying charges, including interest, fire insurance and warehouse charges, for the term of one year following.   The cancellation of the contract of 1907 was made dependent upon the entering into of a new contract—the contract of August 3, 1908.   We had no intimation that the Levy Company disclaimed the authority of Mr. Oppenheim to enter into, or disclaimed the making of that contract, prior to receipt of the letter from Mr. Wise.''   (This letter was written July 29, 1909.)

Witness Newhall was recalled and testified that the meeting to which he had testified occurred before the contract of August 3, 1908, was entered into.   Continuing, he testified :

''In August, 1908, we had negotiations with Charles Levy, Elias Levy and Mr. Oppenheim with reference to the sale

of one thousand bales of bags for future delivery. These negotiations began during the latter part of July, 1908, and occurred in my office. There was present during these negotiations Charles Levy, Mr. Oppenheim and Elias Levy, Mr. Martin and my brother George A. Newhall. We had three interviews. One a few days before this. Q. By Mr. Wise: The conversation about which you are now being interrogated resulted in the execution of this paper of August 3, 1908, which was shown to you yesterday? A. Yes. . . . The witness thereupon was shown plaintiffs' exhibit I. Q. State whether or not you entered into that contract set forth on that paper of the 12th of August, 1907, with the defendant corporation. A. We did. The Court: Q. On August 3, 1908, did your firm have any claim against the Joseph Levy Bag Company for want of compliance with that contract? A. Yes. Q. What was the amount that you claimed as damages for noncompliance? A. The damages were about $12,000.''

Continuing, he testified: ''Q. State whether or not on or about the 3d of August, 1908, or just prior thereto, you waived any claim or demand which you had against the defendant at that time in consideration of its doing certain things, and what, if any, acts it was to perform in consideration of that waiver. A. We made them three offers. We wrote three offers to waive the rights. I can't find them. They were delivered to Mr. Charles Levy. I have not a copy of that letter or instrument. It was just a memorandum. Either Mr. Martin or myself delivered it to Mr. Charles Levy. We were both in the office at the time he was there. It was handed to Mr. Charles Levy in my presence. Mr. Martin wrote out the memorandum. I read it after it was written. I saw it delivered to Mr. Charles Levy. I am able to state its contents. There were three options to close this old contract. One of the options was that they should pay up for the bags and make delivery. The other was that they should pay $7,000 carrying charges and take a new contract at the same price as the contract of 1907. The third option was that they should take a new contract at the ruling price of the market at that date and pay us the difference in cash. This memorandum was delivered to Mr. Levy at the second interview. The third interview was held about the 1st of August.'' Q. State what transpired at the third interview about the 1st of

August. (Objection sustained.)  Q. State what, if anything, the defendant did with reference to availing itself of any of these three options.  A. They accepted the second option, that they would pay— The Court: What did he say?  You say they accepted—who was talking to you and what was stated?  A. Charles Levy.  Mr. Fink: Q. In the presence of whom, if anybody?  A. The presence of Mr. Oppenheim, my brother and Mr. William Martin.  I think Mr. Elias Levy was there. They accepted the second option. · Mr. Charles Levy stated that they would accept the second option.  That is, we were asking $7,000.  They stated that they could not pay but $5,000, but they would give a note for $2,000, and we told him we would accept it if they would put an indorser on the note, and on the 3d of August they brought a check for $5,000 to us and also a note signed by Levy Bag Company and indorsed by Herman Levy.  We accepted that on the 3d of August and then issued the new contract at the same price as the 1907 contract.  On August 3d they came to the office and brought a check on the London, Paris and American bank and the note signed and indorsed by Mr. Herman Levy, and at that time we gave them the new contract at the same price as the old one. ·We turned over the document of August 12, 1907, tearing it out of our book.  Q. Now, I will ask you to state whether or not in your interview with Mr. Charles Levy, Mr. Elias Levy and Mr. Oppenheim about the 1st of August, 1908, anything was said by them about sending around this new contract and the character of it.  A. Mr. Charles Levy accepted the second option and said that he would fix it up in a day or so.  At the same time he said that they ought not to pay more than $5,000. ·We stood on $7,000 and said we could not let them have it for less than $7,000.  On the 3d of August they said then that they would send it around in a day or two.  They sent the check over with the note.''

The witness was asked whether or not plaintiffs would have surrendered the contract, exhibit I, to defendant, ''except in exchange for the check, note and contract of August 3, 1908''; what, if anything, plaintiffs caused to be done to put themselves in a position to deliver the bags under this second contract, but objection was sustained and the witness was not permitted to answer.

"The Court: If there is anything in this case at all it is on a count altogether different from the one that you have got in the complaint. I don't know whether an amendment could be prepared that is proper or not. You had better try and prepare an amended pleading.

"The Witness (continuing): We had the bags on hand from the old contract. I think we had them for a whole year. It was at our expense for the reason that we had to pay storage and insurance and interest. Q. State whether or not you would have so acted except for the contract delivered to you on the 3d of August, by Oppenheim." (Objection sustained.) "Q. Now state whether or not in July and August, 1909, these bags were accepted by the defendant. A. They were not accepted by the defendant; we sold them. We put them in the hands of a bag broker. The market price of bags in that quantity at that time was less than five and one-fourth cents, about five and one-eighth, and the broker was not able to sell them at that price. We finally bought them in ourselves at five and one-fourth cents. We credited the defendant with that amount. We made demand upon the defendant for the difference between the market price of the bags and the contract price. The defendant did not pay us. In the latter part of July we took warehouse delivery orders for one thousand bales and presented them to Mr. Charles Levy and Mr. Oppenheim. That was about the end of July. I think it was about the 27th or 29th. We wrote to them a letter and then we got an answer to that letter from Mr. Wise, and as soon as we got that letter we presented the warehouse delivery orders for one thousand bales with a bill for the total amount. The defendant would not accept them. We had a talk with Mr. Levy on the subject. Q. What did he say? A. He said nothing. It is in the hands of Mr. Wise and we cannot do anything. We had the bags at that time ready to deliver. We had them ready to deliver up to the thirty-first day of July, 1910.

"Mr. Wise: I am willing to admit that plaintiffs will testify to the possession of one thousand bales and the warehouse receipts; that he will testify that they are in his possession; that he had the property and warehouse receipts in San Francisco as testified to by him.

"Mr. Breeze: And will you also admit that we made tender of the warehouse receipts?

"Mr. Wise: I will admit that Mr. Newhall will testify that the tender was made on the day just referred to."

Witness Mills, recalled, testified: "I am acquainted with Elias Levy, William Levy, Charles Levy and Mr. Oppenheim. I was present at an interview at which there was present Mr. Charles Levy, Mr. Oppenheim, E. W. Newhall, Mr. Martin, myself and I think Mr. George Newhall was at his desk, in the latter part of July, 1908, when the contract of 1907 was about to mature. I was the broker in that transaction. Charles Levy and Mr. Oppenheim pleaded that they could not take up the contract. That they did not have the money and could not pay up. They left after stating that. I was present at another interview between them and Mr. Newhall some days after that. There was some talk of the same kind. Mr. Elias Levy was there also. They pleaded their inability again to pay the amount that H. M. Newhall and Company demanded and wanted to cancel the old contract. I had conversations with Mr. Charles Levy and Mr. Oppenheim down in their office with reference to the third option which had been given them by Mr. Newhall. Mr. Elias Levy may have been present. I talked more than once with them. I don't think Mr. William Levy was present. Q. What was said by them about these options?" (Objection sustained.) "Q. I will ask you to state whether or not finally in your presence they decided to accept one of these options?" (Objections sustained.) "Q. State what, if anything, they did with reference to accepting one of these options? A. They told me they could pay $5,000. I know the money was paid and the note was given and the other contract was issued. Samuel Oppenheim took the money up himself. I met him on the street on the way up, and he told me he was going to pay it. I did not see the money paid or the note delivered. Q. After August 3, 1908, and between that date and June and July, 1909, did you have any conversation with either of the Levys or Mr. Oppenheim with reference to the contract of 1908 for one thousand bales?" (Objection sustained.) "Mr. Fink: I offer to prove by this witness that frequently during the period between August 3, 1908, and June and July, 1909, he had conversation with Elias Levy, Charles Levy and Mr. Oppenheim in which their purchase of this one thousand bales of bags under the contract of August 3, 1908, was discussed

with this witness and in which they asked this witness to endeavor if possible to make a sale of the bags for the defendant corporation.'' (Objection sustained.) ''The Witness (continuing): I received a commission on the 1907 deal. Q. Did you receive any commission on the 1908 deal?'' (Objection sustained.) ''Mr. Fink: I offer to prove that he did not.'' (Objection sustained.) ''Mr. Fink: If the court please, that is our case. We ask permission, in the event your honor thinks we have not proved a case under the present complaint, to permit us to file an amended complaint. I have a rough draft of it now. It sets out this entire transaction just as it has been testified to by the witnesses.

''The Court: I don't see that there is any complaint that can be filed in this action under which I can give you relief.

''Mr. Wise: Let the record show a formal motion for a nonsuit upon the ground that plaintiffs have failed to establish a case or have failed to establish any contract as set forth in the complaint, or otherwise, or at all, or have established or proved or submitted any evidence orally or documentary to sustain the allegations of their complaint as to the execution of a contract by defendant or its breach or any damages thereunder.

''The court took said motion under advisement.

''Thereafter plaintiffs prepared an amended complaint and requested leave of court to file the same, which said request the court then and there denied, stating that the document offered as the contract of the defendant corporation is not in law the contract of the defendant; that such contract was never ratified by the defendant; that as the defendant has received nothing under the alleged contract, no estoppel exists or can be proven and for the said reasons and for no other, the court denied the application for leave to file an amended complaint.

''To which ruling of the court plaintiffs then and there duly excepted and now assign said ruling as error.''

This proposed amended complaint set forth the transaction of 1907, the failure of defendants to comply with it, the negotiations following their failure, the surrender of that contract and waiver of the damages which accrued to plaintiffs, the adjustment of those damages and surrender of the contract in consideration of certain money payments and the further consideration that defendant would enter into a new contract,

the contract of August 3, 1908, for the purchase of a like number of bags the following year on like terms, the purchase by plaintiffs of bags to meet the contract, the failure and refusal of defendant to accept them when the time of delivery arrived, the tender and demand made by plaintiffs and, on refusal by defendant, the sale in the open market for the best obtainable price, leaving still due plaintiffs the amount claimed. In brief, this proposed amended complaint alleges the facts and circumstances as proved or sought to be proved and as appears by the foregoing narrative of what took place at the trial.

It is a fact of common knowledge that a very large part of the mercantile business of the country is, as matter of convenience, if not, indeed, as matter of necessity, carried on by corporate organizations rather than by partnerships. It would greatly hamper their usefulness if all the daily current purchases and sales of merchandise could be made only by resolution of directors or that the public dealing with their officers would do so at the peril of having their contracts repudiated when they might happen to be unfavorable to the corporation, or less profitable than was anticipated when made. Suppose an incorporated mercantile house of San Francisco should, in its corporate name, signed by its secretary, and on the verbal authority of the president and one other of the five directors, cable an order to a Paris house for a bale of drygoods of a kind and value previously purchased from the latter by the former. Must the Paris house demand and receive an authenticated copy of a resolution by the board of directors of the San Francisco house authorizing the order for goods before the Paris house could safely fill the order? Suppose the Paris house should ship the goods, and on arrival it happened that they had depreciated in value and the San Francisco house repudiated the contract, claiming their right to do so under the rule now contended for. A system of law that would tolerate such an evasion of responsibility would be unworthy of a civilized people.

Yet that is substantially what happened here. Defendant, by its president, secretary and another director, personally ordered the bags from plaintiffs and the latter, at great cost, purchased them in a foreign market and shipped them to San Francisco, and held them for delivery as they had agreed to do. Meanwhile the price fell off and defendant repudiated

the contract. Indeed, the case is stronger than appears by this simple statement. There is evidence in the record showing the following facts: That, in 1907, defendant executed a contract, whose validity is not to be questioned, to purchase one thousand bales of bags from plaintiffs to be delivered in June or July, 1908, at buyer's option; that plaintiffs purchased bags to meet the contract and had them on hand for delivery; that when the time for delivery arrived defendant was unable to meet its obligations and sought a settlement with plaintiffs; that the damage to plaintiffs resulting from defendant's default was about $12,000; that plaintiffs finally agreed to cancel this contract on condition that defendant would pay them $5,000 cash and execute its note for $2,000 and would also make a new contract for a like number of bags on like terms, delivery to be made in June or July, 1909; that defendant agreed to this, i. e., the president and secretary and one other of the directors so agreed, and the defendant, in its corporate capacity, did in fact pay the money, execute the note and later pay the same; that with the knowledge of these same directors and by their direction and pursuant to the agreement made with plaintiffs, by which defendant was released from the first contract, thus avoiding the payment of the remaining damage caused by defendant's breach of the contract of 1907, the secretary of defendant, and in its name, executed and delivered to plaintiff the contract of 1908 in question; that plaintiffs accepted this contract in part settlement of their claim, proceeded in good faith to meet its requirements on their part, purchased the bags in Calcutta and had on hand for delivery the necessary number, and not until about the last day for delivery were they notified of defendant's repudiation of the contract; that at this time the price of bags had dropped to a point involving the damages claimed by plaintiffs. It appeared that the board of directors consisted of Oppenheim, secretary, Charles Levy, president, Elias and William Levy and one other. It was admitted by defendant *"that the three Levys named were directors and participated with him (Oppenheim) in the conduct of the affairs of the corporation."* The corporation recognized and acquiesced in the contract by paying money, and in its corporate capacity executing a note and paying it, which note formed part of the

contract.    The transaction was in pursuance of the only business the corporation was engaged in—the buying and selling bags, burlap and twine.    In fact, the contract was but the renewal of one canceled, about which latter no question of its validity can arise.    Defendant is seeking to avoid this substituted contract, which plaintiffs accepted in good faith, surrendered a considerable part of their claim for damages under the first contract, expended a large sum of money in purchasing bags to fill the second contract.    We think that the beneficent principle of estoppel was adopted by the courts to meet just such cases as this.    This would seem to us the equitable and reasonable view of the case in the absence of authority. But we think it supported, not alone by its intrinsic merit, but by adjudicated cases of recognized value.

From the viewpoint of the learned trial judge he consistently ruled out both contracts and many questions intended to cast light upon the transactions which, in our view, should have been allowed.    Indeed, from his conception of the case it is somewhat remarkable that he let in the facts which we have been able to extract from the record.

In *Crowley* v. *Genessee Mining Co.,* 55 Cal. 273, the court said of the common-law rule contended for by respondent: "In the United States, nothing more is requisite than to show the authority of the agent to contract.    That authority may be conferred by the corporation at a regular meeting of the directors, or by their separate assent, or by any other mode of their doing such acts.    'If this were not so,' says Mr. Chief Justice Redfield, 'it would lead to very great injustice, for it is notorious that the transaction of the ordinary business of railways, banks, and similar corporations in this country, is without any formal meetings or votes of the board.    Hence, there follows a necessity of giving effect to the acts of such corporations, according to the mode in which they choose to allow them to be transacted.' "

The modern mercantile corporations have come into use since this was written.    Their business is of such a character as to require even greater latitude in conducting their affairs than the classes above named.

In *Gribble* v. *Columbus Brewing Co.,* 100 Cal. 67, 71, [34 Pac. 527, 529], the court said: "The most that can be claimed

is that the contract, as executed, was in excess of the power conferred by the board of directors upon the president; that it varied from his authority. In this respect the transaction does not differ from that of an agent of an individual who has exceeded his authority. That which the principal may authorize an agent to perform he may ratify when performed by the latter without authority. And where with full knowledge of all the facts involved a principal reaps the fruits of the unauthorized contract of his agent, and for some time yields acquiescence to its provisions, he will be deemed to have ratified it, and will be estopped, as against one who has fully performed the contract on his part, from repudiating it to the injury of the latter. And this doctrine applies to corporations equally with individuals''; citing cases. ''A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations rising from it, so far as the facts are known, or ought to be known, to the person accepting.'' (Civ. Code, sec. 1589.) Among the maxims found in the code is the following: ''He who takes the benefit must bear the burden.'' (Civ. Code, sec. 3521.) It was held in *Phillips* v. *Sanger Lumber Co.*, 130 Cal. 431, [62 Pac. 749], that an oral authorization would suffice for conferring an agency to execute the promissory note of a corporation; and it will be ratified by accepting or retaining the benefit of the act, with notice thereof. (Civ. Code, sec. 2310. See *West* v. *Will C. Prather & Co.*, 7 Cal. App. 81, [83 Pac. 892].) Without prolonging the discussion we refer to one more case—*Kelsey* v. *National Bank of Crawford County*, 69 Pa. 426. The cashier of defendant offered a reward for the detection of the thieves who had robbed the bank and the question of his authority arose when plaintiff sought to prove that the reward was offered by the cashier in the presence of some of the directors, pursuant to which plaintiff undertook the detection of the thief; that more than a majority of the directors had knowledge of the offered reward and sanctioned and approved it. The trial court rejected the evidence. On appeal it was held admissible. Among other things the court said: ''It is not necessary to decide whether the cashier *ex officio* had authority to offer the reward in question for the detection of the thieves that robbed the bank. If he had no authority, the

bank is liable for the reward if the offer was acquiesced in and ratified by the directors. The law is well settled that a principal who neglects promptly to disavow an act of his agent, by which the latter has transcended his authority, makes the act his own (*Breden* v. *Dubarry,* 14 Serg. & R. (Pa.) 30); and the waiver which makes the ratification equivalent to precedent authority is as much predicable of a corporation as it is of ratification by any other principal; and it is equally to be presumed from the absence of dissent. (*Gordon* v. *Preston,* 1 Watts, 387, [26 Am. Dec. 75].)'' Quoting from *Bank of Pennsylvania* v. *Reed,* 1 Watts & S. 101, the court said: ''When the principal has been informed of what has been done, he must dissent and give notice of it in a reasonable time; and if he does not, his assent and ratification will be presumed. . . . Nor was it necessary, in order to bind the bank by their acquiescence, that notice should have been given to the directors, when sitting in their official capacity as a board. If they were personally cognizant of the offer made by the cashier, it was their duty to call a meeting of the board and disavow the act, if they were unwilling that the bank should be bound by it. It would be unjust to permit the plaintiff to spend his time and money for the detection of the thief, on the faith of the promised reward, and then repudiate the offer, as unauthorized, when he had succeeded. . . . If the evidence, tending to show that the directors had notice of the offer and that they acquiesced in it, was sufficient to establish the fact, if believed, the case should have been permitted to go to the jury. We think the evidence was sufficient, and that it should not have been withheld from them. It tended to show that the cashier offered the reward at the instance of one of the directors, and upon his suggestion that the directors would bear him out in it; and that the offer was made in the presence of three of the directors; and that the plaintiff 'separately met all the directors and talked the matter over with them,' with the exception of William Davis, Jr. . . . The evidence touching the question was amply sufficient to go to the jury.''

It is our opinion that the learned trial judge tried the case on an erroneous conception of the law; that he refused much evidence which should have been admitted; that the court

erred in granting the nonsuit and that plaintiffs should have been permitted to amend their complaint.

The judgment and order are reversed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 5, 1912.