[Civ. No. 3815. First Appellate District, Division Two.—March 10, 1922.]

GEORGE L. SESSIONS, Respondent, v. PACIFIC IM-PROVEMENT COMPANY (a Corporation), et al., Appellants.

[1] BROKER'S COMMISSION—NEGOTIATION OF SALE.—A broker, in order to bring himself within the conditions of his contract providing for the payment of a compensation on any sale which results through his "negotiations" or through his "efforts," is required to show that he was the efficient cause of the sale.

[2] ID.—EMPLOYMENT ON SALE — RIGHT TO COMMISSION.—Under a contract prescribing compensation to a broker alike whether he "originates" or is "employed" on a sale, his rights are the same whether he is the fertile mind that begins, or is the effective instrument that ends, a continuous series of negotiations leading to a successful consummation.

[3] ID.—CONSTRUCTION OF CONTRACT—FUTURE SERVICES.—A contract providing for the payment of compensation to a broker on any sale "upon which you are employed" is not limited to a sale resulting from services in course of rendition at the date of the contract, where the contract was not a studied production but a communication between two men who had been working together

---

1. When real estate broker is considered as the procuring cause of sale or exchange of real property, notes, 28 Am. St. Rep. 546; 139 Am. St. Rep. 225; 44 L. R. A. 321.

in the same office toward the same end, and who, believing they understood each other, dealt in open-handed fashion, with little thought of niceties in the use of moods and tenses.

[4] ID.—PROCURING CAUSE OF SALE—PROTECTION OF BROKER.—Where there is justification for treating the broker as the procuring cause of sale, his services are regarded as highly meritorious, and the law leans to that construction of the contract and to that interpretation of the facts of the case and the acts of the parties which will best secure to the broker the payment of his commissions.

[5] ID.—WHEN PROCURING CAUSE OF SALE.—To constitute himself the predominating effective cause of a sale, it is not enough that the broker contributes indirectly or incidentally to the sale by imparting information which tends to arouse interest, but he must set in motion a chain of events, which, without break in their continuity, cause the buyer and seller to come to terms as the proximate result of his peculiar activities.

[6] ID.—COMPLETION OF SALE BY ANOTHER — EFFECT UPON COMMISSION.—A broker who is the primary procuring cause of a sale will not be deprived of his commission because the negotiations were completed through someone else, even perhaps without the broker having himself met or communicated personally with the buyer.

[7] ID.—PROCURING CAUSE OF SALE—QUESTION OF FACT — APPEAL.—Whether or not a sale is primarily the result of the broker's efforts is a question of fact, and the determination of the triers of such fact will not be disturbed on appeal.

[8] ID.—SALE OF SITE FOR SHIPBUILDING YARD — BROKER PROCURING CAUSE OF SALE.—Where a broker, acting under his contract of employment, carried on extended negotiations with a shipbuilding corporation for the sale of a site for a· shipbuilding yard, and the land was ultimately purchased at the same price and on the same terms as those named by the broker to the shipbuilding corporation with money furnished by the United States Shipping Board Emergency Fleet Corporation to enable the shipbuilding corporation to take the active management and to build ships under orders in the Fleet Corporation's yard, the shipbuilding corporation and the Fleet Corporation were coadventurers in the purchase, and the broker was the procuring cause of the sale, notwithstanding 'the sale was consummated by the parties themselves.

[9] ID. — TERMINATION OF AGENCY CONTRACT — SUBSEQUENT COMPLETION OF SALE—RIGHT TO COMMISSION.—Allowance of compensation to a broker who was the procuring cause of a sale is not precluded by reason of the fact that the sale was completed more than thirty days after the owner's notice terminating the broker's

contract, notwithstanding the contract provided for termination on such notice, where the notice expressed a willingness to pay the broker a commission on all sales which originated with him or for which in the judgment of the directors of the owner he was responsible.

[10] CORPORATIONS—BROKERAGE CONTRACT—SIGNATURE BY MANAGER—ABSENCE OF AUTHORIZATION — EFFECT OF.—A brokerage contract signed by the acting general manager of a corporation is binding on the corporation, notwithstanding the absence of an express written authorization.

[11] BROKER'S COMMISSION — PREVENTION OF PERFORMANCE — SUIT IN ASSUMPSIT—RIGHT OF BROKER.—A state of facts showing prevention of performance of a contract justifies an action in *assumpsit*, and while a broker's contract cannot be set up to defeat the implied *assumpsit*, it is admissible in evidence to show how the cause of action arose and to supply a measure of damages.

[12] ID.—PREVENTION OF PERFORMANCE — SUBMISSION TO JURY—SUFFICIENCY OF EVIDENCE.—In this action the evidence justified the plaintiff as a precautionary measure in going to the jury on a count based on the theory of prevention of performance.

[13] ID.—ASSUMPSIT—SUM DEMANDED—PLEADING.—In an action in *assumpsit* by a broker, based on the theory of prevention of performance, it is not essential to aver that the sum demanded is the reasonable value of the services, where the contract provision for compensation is relied upon as the standard of value.

[14] ID.—EVIDENCE—CONTRACT.—In such an action the plaintiff was not required to offer any evidence concerning the amount of damages other than the contract itself on which he was entitled to rely as a standard of value.

[15] ID. — ACTION IN TWO COUNTS — ELECTION. — A broker suing an owner for a commission in one count and in *assumpsit* based on prevention of performance in another count is under no compulsion to elect between the counts, but is entitled to submit his entire case to the jury for determination upon the facts, and it is the jury's province to decide which count is supported by the evidence.

[16] ID.—GENERAL VERDICT—EVIDENCE—SUPPORT OF EITHER COUNT.—Where a general verdict is rendered in such a case, the verdict and judgment entered thereon must stand if the evidence supports a verdict on either count.

[17] ID. — ACCEPTANCE OF GOVERNMENT EMPLOYMENT BY BROKER — EFFECT OF.—A broker who was the procuring cause of a sale of a site for a shipyard to the government did not forfeit his right to his commission under his contract by accepting employment with the government's engineers, after the government had obtained an option to purchase, where his assistance furthered

rather than dissuaded action and involved no service in conflict with a due regard to the interests of the vendors.

[18] ID.—INSTRUCTIONS — ABSENCE OF ERROR.—The instructions in this case read as a whole gave an exposition of the law which subjected defendants to no prejudice, and placed the case before the jury in a manner which left to the defendants no just ground of complaint.

APPEAL from a judgment of the Superior Court of Alameda County. Dudley Kinsell, Judge. Affirmed.

The facts are stated in the opinion of the court.

M. C. Chapman, James F. Peck and Allan C. Van Fleet for Appellants.

Gorrill & Trowbridge, Cushing & Cushing, C. E. Snook and Everett J. Brown for Respondent.

JOHNSON, J., *pro tem.*—This is an action for the recovery of $30,000, with interest from September 11, 1918, claimed by plaintiff to be payable to him by reason of the sale of a tract of land comprising 156 acres and forming part of a parcel known as tract 30, situated in the Oakland harbor and belonging to the defendants.

The case was tried before a jury, which rendered a verdict in plaintiff's favor for the full amount of his claim against both defendants. From the judgment thereupon entered the defendants have appealed.

The land in question was conveyed on September 11, 1918, to the United States Shipping Board Emergency Fleet Corporation for the sum of $1,000,000, and plaintiff claims a commission of three per cent.

The property stood of record in the name of the defendant Oakland Water Front Company. That defendant, however, held 434/779 of the land in trust for its codefendant Pacific Improvement Company, and this latter corporation owned about two-fifths of the capital stock of the Oakland Water Front Company.

The tract adjoins another parcel carved out of tract 30, which had previously been sold by the defendants to the Union Iron Works and upon which was located the so-called Alameda plant of the Bethlehem Shipbuilding Corporation,

one of the instrumentalities used by the United States government in providing itself with ships during the war.   The purchase made by the Emergency Fleet Corporation was for the purpose of establishing a shipyard to be known as the Liberty Shipyard, for use by the Bethlehem Shipbuilding Corporation, in conjunction with its own plant, with a view to speedy augmentation of the supply of ships then so urgently needed for the transport of troops and stores to the seat of war in Europe.

Acting under a contract which will presently be mentioned, plaintiff had carried on extended negotiations with representatives of the Bethlehem Shipbuilding Corporation between June, 1917, and April, 1918; and while these negotiations were undeniable links in the chain of causation, yet it is contended by defendants that plaintiff was not the immediate instrument through whom the sale to the Emergency Fleet Corporation was ultimately effected.   It is chiefly upon this ground that plaintiff's claim to compensation is resisted by the defendants.

The defendants owned extensive areas of marsh and tide lands along the Oakland estuary which they were desirous of marketing; and in furtherance of that design, they took plaintiff into their employ in 1915, agreeing to pay him a stated monthly salary and a commission of two and one-half per cent of the proceeds derived from sales of land made with his aid.

Plaintiff is a civil engineer by profession, and he came to this service with special knowledge of the property, acquired during a business association of almost a decade with his father, a specialist in such lands, from whom also had been transmitted to plaintiff a storehouse of information and data which enabled him to render, with respect to these lands, a unique service.

The employment of plaintiff on the terms mentioned continued until July 1, 1917, and plaintiff's duties pertained to the work of dredging, reclamation, and development of the properties, combined with endeavors to find purchasers.

The lands were partly submerged and considerable reclamation work had to be done in order to prepare them for sale. For the purpose of giving access to ships and providing other facilities, it was necessary to dredge waterways, deepen

channels, and impound filling material; and of all this work plaintiff had charge.

During plaintiff's original employment and by his aid the Alameda plant of the Bethlehem Shipbuilding Corporation was sold by defendants to the Union Iron Works in March, 1917.

From a time antedating plaintiff's engagement the two defendants have had a common office in the Crocker Building, in San Francisco, and their administrative work has been done by a single staff of clerks. The directorates of the companies, while not identical in membership, have had a majority in common; and throughout the period of plaintiff's service the office management of both companies was in the hands of S. F. B. Morse. Officially he was the general manager of the Pacific Improvement Company and the secretary of the Oakland Water Front Company; and actually, as he himself testified and as the evidence otherwise shows, he was "the man in charge of the business of both companies."

Such was the state of affairs when on June 21, 1917, a new contract of employment was made with plaintiff, evidenced by the following letter written on a letter-sheet of the Pacific Improvement Company:

> "Pacific Improvement Company
> "Crocker Building, San Francisco.
>
> "June 21st, 1917.

"Geo. L. Sessions, Esq.,
> "401 Crocker Building,
> "San Francisco,
> "California.

"Dear Sir:

"Your present connection with the Pacific Improvement Company, whereby you receive a certain salary, terminates the first of July. After that, you will work on the sale of the Oakland Water Front Company property on a commission basis.

"We will pay you a commission of three percent (3%) on any sale that results through your negotiations, or efforts, or which originates with you, or upon which you are employed.

"Until further notice we will not appoint any other agent or agents. This arrangement is subject to cancellation upon (1) month's notice.

"Yours very truly,
"S. F. B. MORSE,
"General Manager.

"SFBM/GP."

This new arrangement became effective on July 1, 1917, and under it plaintiff continued to render the same character of service as before. Apparently the only change made in the relation between him and the defendants was that he no longer received a stated salary, and in case of a sale he became entitled to a somewhat larger commission.

The land in question possessed a location which was pronounced "an ideal shipyard" by Mr. Tynan, the chief local representative of the Bethlehem Shipbuilding Corporation; and plaintiff bent his energies toward putting the land into condition for ready sale. Under his direction plans and surveys for dredging operations were made and reclamation work was pressed forward. At the same time plaintiff kept the attention of the representatives of the Bethlehem Shipbuilding Corporation fastened on the property, and presented detailed information in a form which pictured the peculiar merits of the tract for shipbuilding purposes.

While these negotiations were being conducted, a small sale of a neighboring parcel was made in October, 1917, by plaintiff for defendants, for which plaintiff received the commission stipulated in his contract. And it is not without significance that while the Oakland Water Front Company disputes the authority of Mr. Morse to act for it as manager, yet the check given to plaintiff for the amount of his commission was the check of that company.

With respect to the tract in question, plaintiff between June, 1917, and April, 1918, had frequent meetings with Harrison S. Robinson, attorney for the Bethlehem Shipbuilding Corporation, and with J. R. Christy, manager of its Alameda plant. Through them, maps, surveys, and other appropriate data prepared under plaintiff's direction were brought to the attention of Joseph J. Tynan, who had general charge of the Bethlehem Shipbuilding Corporation's interests about San Francisco Bay. In consequence of plaintiff's activities both Robinson and Christy became im-

pressed with the superior advantages of the property; and their opinions, communicated to Tynan, had a potent influence in leading him to recommend the purchase by the government.

While plaintiff was constantly urging that the Bethlehem Shipbuilding Corporation should purchase the property for itself, such was not the thought in the minds of those who were speaking for that company.

In January, 1918, Christy told plaintiff that the Bethlehem Corporation would probably not buy the tract, but that he wanted to find out about the land for the Fleet Corporation.

In February the Bethlehem Corporation and the Oakland Water Front Company arranged to join in a dredging operation to improve the launching facilities in front of their respective lands; and a certain permit of the city council of Alameda being necessary, there was presented to the council, through the Bethlehem Corporation, a letter from A. F. Pillsbury, the district officer of the United States Shipping Board, asking favorable action on the part of the council in the interest of the government's shipbuilding program. Plaintiff attended the sessions of the council and assisted in getting the permit.

The dredging contract, made by the Bethlehem Corporation and the Oakland Water Front Company with a dredging company under the supervision of plaintiff, was executed March 18th. In so far as the defendants' tract was concerned, the work contracted for tended to enhance the salability of the land for shipping uses. It is not inconsequential, therefore, that on the very day the dredging contract was signed Mr. Robinson, the attorney for the Bethlehem Shipbuilding Corporation, called at the office of the defendants and asked plaintiff for a price on the property in question, saying that he was not inquiring for the Bethlehem Corporation but for other interests which he himself could not then identify. Plaintiff, in the presence of the assistant secretary of the Oakland Water Front Company, named $1,000,000, and on the following day Morse notified Robinson that the price quoted by plaintiff was approved. This offer was coupled with the condition that the purchaser should assume the expenses for the dredging work already undertaken. Before ratifying the price quoted, Mr. Morse

had telephoned to, and received the assent of, Mr. Hammond, a director of both the defendants, who was regarded as having the controlling voice on the question of price, and in his conversation with Hammond, Morse informed him that the sale would be subject to a three per cent commission to plaintiff.

Immediately after the conversation with Robinson, Morse instructed plaintiff to make no further quotations to brokers on lands of the Oakland Water Front Company, and a little later Morse informed plaintiff that an offer of $500,000 had been made through Christy to Hammond. This offer plaintiff advised Morse not to accept.

At this juncture there was launched on March 21st the portentous spring drive of the German army through the allied line, the impulse of which continuing to April 1st made that Easter season probably the darkest the world has ever seen, and led General Haig to declare that the allies were with their back against a wall. Straightway the United States proclaimed its determination to quicken mightily the transport of troops, and the Emergency Fleet Corporation girded itself for the task of speeding the building of ships.

In this posture of affairs the Bethlehem Corporation's agents did not confine themselves to inquiries concerning tract 30, but investigated as well other sites about the bay which might be available for government use.

While matters were proceeding in this fashion, plaintiff received, on April 3d, the following letter:

> "Pacific Improvement Company
> "Crocker Building,
> "San Francisco.
>
> "April 3, 1918.
>
> "Mr. George L. Sessions,
> "Office.
>
> "Dear Sir:
>
> "This will give you notice that the arrangement which I made with you in letter of June 21st 1917 is terminated.
>
> "Hereafter, until further notice, you will be paid three per cent commission on any sales made of The Oakland Water Front Company properties in which this company is interested which originate with you, or for which, in the judgment of the directors, you are responsible. Any offers

which come to us direct, or sales which result as a direct offer to us in which the directors feel you have not had an important part, you will not receive a commission, or if you are compensated the amount of the compensation shall rest entirely in the hands of the directors of the company.

"Very truly yours,

"(Sgd)   S. F. B. MORSE,

"General Manager.

"S. F. B. M./GP."

On receipt of this letter plaintiff expressed to Mr. Morse dissatisfaction with its terms, and called to Morse's mind the negotiations already had with the Bethlehem Shipbuilding Corporation, saying that he believed a sale through Robinson and Christy would soon come about. By reason of plaintiff's unwillingness to assent to the changes proposed, he "declined to develop new service under that agreement," as he tells us, and about April 16th he moved from the office of the defendants.

He did not, however, abandon the negotiations previously initiated.

At various times after leaving the office plaintiff called on Robinson and discussed with him the reclamation work then going on and the subsoil conditions.

Thus matters continued without any new developments until early in May, 1918, when J. W. Powell, vice-president and general manager of the Bethlehem Shipbuilding Corporation, visited San Francisco. Powell had been at the Alameda plant of his company about six months previously, at which time Christy had called his attention to this portion of tract 30; and on this occasion in May Powell's visit was in part with a view to informing himself concerning additional shipyard space, which might be acquired through the Emergency Fleet Corporation for the operations of his company. And he told Christy that the government was considering the construction of an immense shipyard, and that he was going to submit data to the officials of the government.

In their conversation Christy stated to Powell that tract 30 was probably the best and most available site around the bay, and its merits were discussed together by Powell, Tynan, and Christy.

As Mr. Tynan testified, the matter of the purchase of tract 30 "got very serious when there was a possibility of the

Emergency Fleet Corporation putting in a shipyard there.''
This was because such increase of facilities would mean increased work for the Shipbuilding Corporation.

Realizing that Robinson had a much more intimate knowledge of the details of previous negotiations, Tynan had Robinson join Powell and himself at the Alameda plant. The substance of Robinson's conference at that time is best told in his own words:

''Mr. Powell said, 'I understand you have a site here for a big shipyard.' We then, standing at the end of the wharf, fitting up wharf on the Alameda plant, from the end of that, you could look over the balance of tract 30. He said, 'The Fleet Corporation is pretty nearly determined that they must put themselves in a position to build as speedily as possible a large fleet to transport—for the carrying of troops—that is the critical thing that is coming—and they want to build extensions to existing yards, in order that the building operations may proceed with the greatest possible rapidity, and it has been suggested by Mr. Tynan and Mr. Christy, and I understand by you'—said Mr. Powell—'that this site here'— pointing out over the rest of that tract 30—'is well fitted for the purpose named.' The conversation continued, I cannot remember, of course, all that was said, and then Mr. Powell asked me if I had—we discussed the depths and all of the features, the site, the foundation, the waterfront, whether he could get sixteen slips, building berths in along the front, or adequacy of the remaining space for fitting up wharves; the matter of getting railroad transportation into the yards; where the lines of steam railway were; the matter of street-car transportation for workmen; the matter of getting fuel oil; getting electric power and gas for manufacturing purposes—all of those various features of the site were discussed. And Mr. Powell asked me if I had any written data or formal data of the matter which he could take back with him. I told him that I had in my possession, and had had in my possession, surveys, survey plats, of this tract 30, and a vicinity map, which showed its relation to property and the adjacent waterways, and the adjacent railway facilities, and another map which showed the borings and soundings; that is, depths of water and the depths of hardpan on which a foundation could rest all over that tract; and Mr. Powell asked me if I would get several copies

of those maps, and any other formal data to him as soon as possible in order that he might take it east with him for the information of the officials of the United States Shipping Board, who had asked him to take the subject up when he was out here.

"Q. And those maps and plats that you had at that time were furnished by whom? A. George Sessions."

That same day Robinson and Powell went to the office of the defendants and there had a discussion with the assistant secretary of the Oakland Water Front Company, from whom they procured several copies of the maps which Powell wished to take east with him.

On May 10th additional maps and data were sent to Powell by Morse.

In the negotiations which plaintiff had had with Robinson and Christy, plaintiff had told them that when it came to fixing a price and arranging terms, it would be best to deal directly with Mr. Hammond; and this information was communicated by them in turn to Mr. Tynan. So immediately after the meeting with Robinson, Powell asked Tynan to see the owners; and Tynan, accordingly called upon Hammond at once, who named to him the same price which plaintiff, with the approval of Morse and Hammond, had previously quoted to Robinson  Tynan thereupon reported the price to Powell and recommended the purchase, and on May 11th Powell, as vice-president of the Bethlehem Shipbuilding Corporation, wrote to Hammond, and after referring to Tynan's call added that Hammond's "proposition to dispose of this property for the purpose of the construction of a shipyard by the United States government for the sum of $1,000,000" had been forwarded to Washington and he hoped to be able to get a definite answer within a fortnight. On May 13th Hammond wrote in reply that the Oakland Water Front Company would hold itself in readiness to deed the property to the United States government at the price mentioned.

Mr. Powell, who had become convinced of the desirability of the purchase, hastened back east and there presented the matter personally to the officials of the Emergency Fleet Corporation. His recommendation resulted in a decision to purchase the site and turn it over to the Bethlehem Shipbuilding Corporation, for use as a shipyard at which ships should be built under a contract with the government. This

contract bears date June 21, 1918, and recited in formal terms that the Bethlehem Corporation having facilities sufficient for its ordinary needs, the Fleet Corporation would purchase the shipyard site, and that the Bethlehem Corporation, as superintendent for the Fleet Corporation, was to make the shipyard ready for use, and there engage in the construction of ships as outlined in the agreement, in order to minister to the government's needs in the pressing emergency.

When the decision was reached, the Emergency Fleet Corporation, acting upon a suggestion of Robinson, arranged first to take an option to purchase. On June 21st, the very day of the contract with the government, Powell notified Tynan that the Emergency Fleet Corporation was "handling the purchase" and requested Tynan to help as much as possible. By reason of this request Tynan had Robinson meet Hammond, and after they had discussed together the provisions of the proposed option, the formal document was prepared by Robinson. The option ran for sixty days and the price named was that originally quoted to Robinson by plaintiff and confirmed to Powell by Hammond. The option bore date of July 1, 1918, and was actually executed by the Oakland Water Front Company on July 2d. Attached to the option was a copy of a map prepared by plaintiff and previously furnished by him to Robinson. On July 31st the Emergency Fleet Corporation elected to exercise the option and gave written notice accordingdy. Under date of August 3d, the Oakland Water Front Company acknowledged receipt of this notice, stating that it understood the notice to be an unqualified acceptance of the option and that a binding contract was accordingly in effect. This acknowledgment was signed on behalf of the Oakland Water Front Company by "S. F. B. Morse, Manager." On September 11th the deed, which, like the option, was prepared by the attorney of the Bethlehem Corporation, was executed by the Oakland Water Front Company to the United States Shipping Board Emergency Fleet Corporation, and the agreed purchase price was paid by the government.

While these occurrences were taking place no information was conveyed to plaintiff by either of defendants. But about June 6th the plaintiff called on Robinson to discuss matters pertaining to the reclamation work and the drainage of the

land and to urge the purchase of the tract. At that time he learned from Robinson that Hammond's written offer was before the Emergency Fleet Corporation. On June 13th plaintiff and Robinson had another discussion concerning the drainage problem. At Robinson's request plaintiff called also on certain engineers who were acting as advisers for the government, and not only discussed the tract with the engineers and Robinson but accompanied them to the tract itself. The purchaser was allowed to take possession in June, and during the course of the investigations the engineers looked often to plaintiff for historical data and special information not easily obtainable elsewhere. In these matters plaintiff showed a willingness to assist; and apparently his services were found of such value that about the middle of July he was employed by the engineers as an adviser and particularly to furnish the desired historical information. He continued in such employ for about three months, though meanwhile the purchase price was paid and the deed taken by the Emergency Fleet Corporation.

The complaint contains two counts, each setting forth a claim for $30,000 and interest; the first, a cause of action based on the contract of June 21, 1917; the second, a cause cast in the form of a complaint *in indebitatus assumpsit.* Defendants assert that the second count and any verdict thereunder are vulnerable because of defects both of pleading and proof. But since the defendants' attack upon the judgment cuts deep into the vitals of the contract, it will be more profitable to consider first the essential merits of plaintiff's claim, disregarding for a time the questions of technique.

Defendants contend that there can rightly be no recovery by plaintiff, on the ground that he was not the procuring cause of sale; and they maintain that the owners made the sale without the least aid from the plaintiff, and through negotiations begun by themselves more than thirty days after the letter of April 3d, with a buyer with whom the plaintiff had never been in touch.

The contract of June 21, 1917, is quite different from the ordinary brokerage agreement. It affords to plaintiff four disjunctive bases for compensation. It contains a promise to pay compensation on any sale (1) which results through plaintiff's negotiations, or (2) through plaintiff's efforts, or

(3) which originates with plaintiff, or (4) upon which plaintiff is employed.

[1]    There is no appreciable difference in the meaning for present purposes between the words "negotiations" and "efforts." In either case, in order to bring himself within the conditions of his contract, plaintiff would be required to show that he was the efficient cause of sale. The two other expressions definitive of his contractual right embody, however, contrasting ideas. They are expressive of a distinction corresponding to the important distinction between finding a purchaser and negotiating a sale (*Handley* v. *Shaffer*, 177 Ala. 636, 653 [59 South. 286]).

To originate a sale is to give to it a genesis, to stand as the parent, the creative force from which the final transaction traces its birth. The word carries no implication requiring the originator to be also the finisher, or to be at once the Alpha and the Omega. On the other hand, one may, of course, be employed upon a sale which he has not originated, and in that event he is in the ordinary position of a broker and subject to the common rule. One who merely originates a sale may be compared to the one who starts a hare which another is left to run down; while one only employed on a sale is like the man who runs down the hare which someone else has started.

[2]    Under a contract prescribing compensation to the broker alike whether he originates or is employed on a sale, his rights then will be the same whether he is the fertile mind that begins, or is the effective instrument that ends, a continuous series of negotiations leading to a happy consummation.

[3]    Referring to the terms under interpretation, counsel for defendants ask that the words be scrutinized to determine their precise meaning; and it is urged that the phrase, "upon which you are employed," cannot be extended to include a sale brought about by future use or employment of plaintiff's services, but must be limited to a sale resulting from services in course of rendition at the date of the agreement. We do not think, however, that the contract should be so meticulously construed. The present is frequently used for the future tense, not only colloquially, but also in statutes and contracts. Here it is quite apparent that the agreement was not a studied production. It was

rather a communication passing between two men who had been working together in the same office toward the same end, and who, believing that they understood each other, dealt in open-handed fashion, with little thought of niceties in the use of moods and tenses. There is no reason, therefore, for subjecting the phraseology to a comminuting analysis, or for sifting it through the mesh of legal dialectics. [4] In fact, wherever there is justification for treating the broker as the procuring cause of sale, his services are regarded as highly meritorious, and the law leans to that construction of the contract and to that interpretation of the facts of the case and the acts of the parties which will best secure to the broker the payment of his commissions. (*Stewart* v. *Måther*, 32 Wis. 344, 350; *Duncan* v. *Borden*, 13 Colo. App. 480, 482 [59 Pac. 60].)

But taking the contract as it is written, defendants assail the judgment on the ground that plaintiff neither originated, nor was employed upon, nor negotiated, nor exerted his efforts in, the sale to the Emergency Fleet Corporation; and they insist that the negotiations with that corporation were undertaken and completed by the defendants themselves through Mr. Hammond, after plaintiff's efforts with the Bethlehem Shipbuilding Corporation had come to naught, and after the contractual relations between plaintiff and defendants had been completely severed.

The jury were instructed as to the meaning of the expressions used by the parties, and received also in appropriate form a definition of the term "procuring cause of sale." But despite the import of the phrase "which originates with you," the court concluded its instructions by declaring to the jury that they were not to render a verdict in favor of the plaintiff unless they should find that the influence, means, or efforts put forth by plaintiff between July 1, 1917, and April 3, 1918, were "the procuring and efficient cause that resulted in the sale to the United States Shipping Board, Emergency Fleet Corporation."

In view of the interpretation which has been given to the word "originate," and which does not differ in sense from the meaning ascribed by the trial judge, we think the court's instruction was really more favorable to the defendants than they were entitled to. But since under that instruction a verdict was given in plaintiff's favor, it devolves upon us to

consider whether, upon the law as applied to the evidence already detailed, plaintiff can fairly be deemed the efficient cause of the sale to the Emergency Fleet Corporation.

In *Roth* v. *Thomson*, 40 Cal. App. 208, 215 [180 Pac. 656, 659], the court, quoting from *Park* v. *Culver*, 169 Mo. App. 11 [154 S. W. 806], gives the following definition of the expression "procuring cause": "In order for the broker to recover, the evidence must show that his efforts were the procuring cause and not merely one in a chain of causes. The expression 'procuring and inducing cause' as used in the books refers to the cause originating from a series of events that, without break in their continuity, result in the prime object of the employment of the agent."

Where several agencies have been active in bringing about a sale, it may happen that each has contributed something without which the result would not have occurred. One may have found a buyer who would otherwise have been overlooked, and yet that buyer may actually make his bargain through a different instrumentality. In such case, the crucial question is, which was the predominating efficient cause? A broker's contract presupposes that he shall be the *causa causans*, the foundation of the negotiations, but he need not be the sole cause or *causa sine qua non.* (*Handley* v. *Shaffer*, 177 Ala. 636, 652 [59 South. 286].)

[5] To constitute himself the *causa causans*, the predominating effective cause, it is not enough that the broker contributes indirectly or incidentally to the sale by imparting information which tends to arouse interest. He must set in motion a chain of events, which, without break in their continuity, cause the buyer and seller to come to terms as the proximate result of his peculiar activities.

In *Hafner* v. *Herron*, 165 Ill. 242, 246 [46 N. E. 211, 212], the court says: "Nor is it always necessary that the purchaser should be actually introduced to the owner by the broker, provided it appears affirmatively that the purchaser was induced to apply to the owner through the instrumentality of the broker, or through means employed by the broker. It is sufficient if the sale is effected through the efforts of the broker or through information derived from him."

To like effect are *Lloyd* v. *Matthews*, 51 N. Y. 124; *Sussdorff* v. *Schmidt*, 55 N. Y. 319; *Handley* v. *Shaffer*, 177 Ala. 636 [59 South. 286]; *Shannon* v. *Potts*, 117 Ill. App. 80; *Masters* v. *Hunt* (Tex. Civ. App.), 197 S. W. 219; *Haun* v. *Rosenmayer*, 46 Cal. App. 353 [189 Pac. 117]; *Justy* v. *Erro*, 16 Cal. App. 519 [117 Pac. 575].

[6] So when the broker is in fact the primary procuring cause, the law will not deprive him of his commission because the negotiations were completed through someone else, and even perhaps without the broker having himself met or communicated personally with the buyer. As it is sometimes put in homely phrase in such cases, "He who shakes the tree is the one to gather the fruit."

[7] Whether or not the sale is primarily the result of the broker's efforts is a question of fact. The jury here, under the instructions given, may be assumed to have resolved the evidence in plaintiff's favor in this regard; and in the light of decisions rendered in analogous cases, we would not be justified in overriding the determination of the triers of the fact.

A case quite closely in point is found in *Carnes* v. *Finigan*, 198 Mass. 128 [84 N. E. 324]. There the defendant employed the plaintiff to find a buyer for his liquor business. The plaintiff, knowing that a certain brewery often advanced money to buy saloons for persons who would engage to deal in the company's brew, gave to the brewery's vice-president, Casey, the name of defendant's saloon and also of two others. Casey, in turn, brought the saloon to the notice of one of the brewery's patrons named Silva, who with the brewery's money made his purchase of the business directly from the defendant, and without any communication with the broker. Casey acted in the matter not as the agent of the broker but for the benefit of his own brewery. After pointing the distinction between such a case and a case where the purchaser's dealings with an owner were indirectly brought about through information given by a broker to another and by him casually imparted to the buyer, the court said: "But in the case at bar, although Casey did not intend to act as the agent for the plaintiff, the plaintiff intended to use Casey as an instrument in getting a purchaser for the defendant's saloon, and he was successful in getting a purchaser by

those means. Casey did what the plaintiff hoped and expected he would do when he furnished him with the name of the defendant's liquor business for sale, namely, he brought it to the attention of a man to whom he was willing to advance the money necessary to buy the business in order to get another purchaser of his (Casey's) company's ale. In our opinion this was sufficiently direct to make out the fact that the plaintiff's services were the cause of the sale.''

Another case worthy of study is *Burchell* v. *Gowrie & Blockhouse Collieries* [1910], L. R. App. Cas. 614. The defendant, a British corporation and the owner of a coal mine in Nova Scotia, desiring to sell its property, employed for that purpose the plaintiff Burchell, who was a mining engineer and manager of the colliery. Burchell presented the matter to a successful promoter named Pearson, who was the leading spirit in a company owning a neighboring mine. Burchell had Pearson inspect the defendant's property and showed him the opportunities presented for more advantageous development of Pearson's own mine through prosecuting certain workings already under way in defendant's property. Pearson, convinced of the superiority of this method of approach, took an option which, after certain renewals, was allowed to lapse on account of financial stringency. Negotiations continued, however, and later another engineer, Richardson, was sent from England to inspect defendant's mine and report for the information of the stockholders. While engaged in this work, Richardson met MacDonald, a director in Pearson's company, who had already been brought into privity with the negotiations between Burchell and Pearson, and met also McCurdy, a son-in-law of Pearson. Richardson and these two others returned to England in the same ship, and there, without the knowledge of Burchell, the defendant entered into an agreement of sale with MacDonald and McCurdy, and the property was ultimately consolidated with that of Pearson's company. When Burchell demanded his agreed commission, the defendant claimed that he was not the procuring cause of sale, and that the transaction was the direct result of efforts of MacDonald. The court, however, regarded Pearson as the dominating personality in the negotiations which culminated in the sale, and treated Mac-

Donald and McCurdy as Pearson's agents, or coadventurers. Hence, the sale having been induced by the knowledge, exertions, and skill of Burchell, and he having first introduced the company to the purchaser, the court awarded him his commission, saying at page 625: "Pearson, acting with his associates in the interests of the North Atlantic Colliery, was the purchaser introduced. Pearson with his coadventurers acting in the same interests was the actual purchaser; in fact, nothing was in reality altered but the consideration to be paid. Stock was to be given in a larger proportion than Burchell was authorized to accept. In all other respects the sale made and the sale authorized to be made by Burchell were in effect the same."

[8] So in the case at bar plaintiff intended to use the Bethlehem Shipbuilding Corporation either as a purchaser itself or as an instrument in getting a purchaser; and affairs so shaped themselves that the Bethlehem Shipbuilding Corporation and the Emergency Fleet Corporation came into close privity with each other in the transaction. They were coadventurers in the purchase, the Fleet Corporation furnishing the money to buy the property and the Shipbuilding Corporation agreeing to take the active management, and to build ships under orders in the Fleet Corporation's yard. The transaction as ultimately carried out was at the same price and on the same terms as those named by the plaintiff in March to the Bethlehem Shipbuilding Corporation. It turned out, it is true, that the contract of purchase was made, and the purchase price was paid, by the Fleet Corporation instead of by its coadventurer, the Shipbuilding Corporation. But in the consummation of the sale the Shipbuilding Corporation acted as agent for the Fleet Corporation, and the transaction assumed the same form as if the Shipbuilding Corporation had been the legally constituted agent of the Fleet Corporation from the beginning. In his negotiations with the officers of the Shipbuilding Corporation plaintiff had performed the most effective and perhaps the hardest and most expensive part of the whole undertaking. The defendants knowingly took advantage of his labors, and concluded a contract of sale with a purchaser with whom they had really been put into touch by plaintiff. And that sale was made on terms which, under defendant's directions, had already been

named by plaintiff to the intermediary. The sale was, beyond a doubt, the direct result of the original impulse proceeding from the plaintiff. It was brought about without the interpolation of any independent agency and was closed in continuation of the negotiations initiated, and almost to the last moment conducted, by plaintiff alone. The worth of the plaintiff's service is not to be depreciated by attributing the sale to defendant's common director, Mr. Hammond, or by expunging all the intelligent effort, whereby the plaintiff had so well laid out the pathway that Mr. Powell had but to follow the finger-post pointing to Mr. Hammond's door, and then, after a short conversation, depart with Mr. Hammond's written offer in his pocket to lay before his company's coadventurer for final action.

The views expressed receive support also from five cases cited in the plaintiff's brief which possess resemblances to the case at bar; these are, *Lincoln* v. *McClatchie*, 36 Conn. 136; *Lloyd* v. *Matthews*, 51 N. Y. 124; *Sussdorff* v. *Schmidt*, 55 N. Y. 319; *Hosmer* v. *Fuller*, 168 Mass. 274 [47 N. E. 94]; *Brooks* v. *Leathers*, 112 Mich. 463 [70 N. W. 1099].

[9] But it is contended by defendants that the fact that no agreement of sale was made before the letter of April 3d, or at most within thirty days thereafter, precludes the allowance of any compensation to plaintiff. A broker with a contract in the ordinary form must unquestionably effect a sale within the limit of time granted. Plaintiff's contract was subject to cancellation on one month's notice. The letter of April 3d read as a whole does not purport to abolish the original contract entirely. The letter expresses willingness to pay a commission of three per cent "on any sales made of the Oakland Water Front Company property in which this company is interested, which originates with you, or for which, in the judgment of the directors, you are responsible."

Here was a clear recognition of a continuing obligation to pay the commission on any sales originating with the plaintiff. Hence, nothing in this letter attempts to abrogate plaintiff's unquestioned right to compensation on sales originating with him. The sale effected did originate assuredly with plaintiff; therefore, the mere fact that under

the circumstances in evidence that sale was closed after the letter of April 3d cannot militate against recovery of the compensation promised for such service.

Nor does plaintiff's withdrawal from defendants' office impair plaintiff's rights. He was not required by his contract to be in attendance at any particular place, but was working on commission with a right to control his own actions and be master of his own time.

It is true plaintiff "declined to develop new service" under the terms of the April letter, but neither the contents of the letter nor plaintiff's conduct at the time furnish just reason for plucking from him the fruits of his efforts already exerted. His effective work had been done and the terms had already been named to the Bethlehem Shipbuilding Corporation. The situation was, therefore, the same in substance as if plaintiff had brought the Fleet Corporation itself as a buyer to the defendants' office before the receipt of the letter of April 3d and had then left the parties to close the bargain themselves.

Under such state of facts, the postponement of the actual closing of the bargain until after the cessation of agency would not of itself be sufficient to alter the broker's character as the procuring cause of the sale or to deprive him of his reward. The Bethlehem Corporation was but the messenger for the Fleet Corporation, and the Fleet Corporation on its appearance adopted the acts of its messenger. This was equivalent to a previous request to perform such acts.

In *Lincoln* v. *McClatchie,* 36 Conn. 136, a purchaser, Burdick, had obtained information about a residence from a friend, Goodwin, living in the vicinity, who, knowing Burdick's desire to be a neighbor, had procured for him particulars from plaintiff, the broker in whose hands defendant had placed the property for sale. Burdick purchased directly from the owner without himself ever having communicated with the broker. The court said (36 Conn. 142) : "Had Burdick in the first instance requested Goodwin to do what was done by him in this transaction, the case would have stood precisely as if Burdick had procured the information himself from the plaintiff, on the principle *qui facit per alium facit per se,* and the defendant in that case would clearly have been liable. Is the case

materially different? Goodwin acted for Burdick in procuring the information. He did not casually obtain it, but went to the office of the plaintiff to ascertain what intelligence he had to disclose. Burdick acted upon the information when communicated to him by Goodwin, knowing from what source it had been obtained. He adopted the acts of Goodwin, which was equivalent to a previous request to perform the acts. The plaintiff was pursuing the business of a broker in giving the information, and Goodwin received it for Burdick in the capacity of a messenger and conveyed it to him.''

In the present case the court in its instructions told the jury that they could not give plaintiff a verdict unless they found that the procuring and efficient cause of sale was plaintiff's efforts exerted after July 1, 1917, and before April 3, 1918. During the time intervening between the latter date and the visit of Powell in May there had been no real break in the negotiations, and hence on Powell's arrival there was no independent revival of negotiations. Powell merely took the thread from Robinson's fingers.

We feel convinced that the evidence justified a finding that plaintiff's efforts exerted before April 3d were the procuring cause of sale notwithstanding that the first positive disclosure of the Fleet Corporation's interest was reserved until Powell's visit.

Yet, even if the verdict were not to be rested on that ground, it cannot candidly be gainsaid that the sale originated with plaintiff before April 3d. And a sale so originating with him establishes his rights as fully as one negotiated and closed by his sole efforts during the period of his admitted agency.

[10] Nevertheless, however meritorious plaintiff's accomplishment, defendants advance the objection that the statute of frauds opposes an insuperable barrier because there was no written authorization to Morse to sign the letter of June 21, 1917. The jury, under adequate instructions, has impliedly found Morse to have been acting as general manager of both corporations, and there is ample support for that finding in the evidence. The signature of Morse as general manager, unattended by the subscription of any corporate name, made evidence admissible to show his relation to the parties and to assist in the ap-

plication of the context of the letter to the subject matter in litigation. (*Union Oil Co.* v. *Purissima Oil Co.*, 181 Cal. 479 [185 Pac. 381].)

Additional authorities are collated by Justice Sloan in *Swartz* v. *Burr*, 43 Cal. App. 442 [185 Pac. 411].

In *Brown* v. *Crown G. M. Co.*, 150 Cal. 376, 386 [89 Pac. 86, 91], the court said: "It is conceded that in order to bind a corporation by its acts it is not necessary that any resolution should be passed appointing the general manager. It will be sufficient for it to be shown that he was manager *de facto.*"

And in *Hoffman* v. *Guy M. Rush Co.*, 27 Cal. App. 167 [149 Pac. 177], it was held that the president in his capacity of actual manager of defendant's real estate business had authority to employ a broker and bind the corporation to pay for the services rendered. In like manner in *Norton* v. *Genesee Assn.*, 57 App. Div. 520 [68 N. Y. Supp. 32], the rule is laid down that the general manager of a corporation engaged in the business of buying and selling land is vested with general authority to employ a broker in furtherance of such business.

So in *California & Ariz. L. Co.* v. *Cuddeback*, 27 Cal. App. 450 [150 Pac. 379], it was decided that plaintiff's president, who was also the acting general manager, had power in this latter capacity to enter into a contract in the company's behalf for the purchase of a tract of land.

Again, in *Betts* v. *Southern California Fruit Exch.*, 144 Cal. 402 [77 Pac. 993], where the secretary dicharged in addition the functions of a general manager, a contract for the sale of fruit was held binding on the defendant, though signed only by the secretary as such and though he himself acted without written authority from the corporation. (See, also, *Newhall* v. *Joseph Levy Bag Co.*, 19 Cal. App. 9 [124 Pac. 875].)

Likewise, in *Woods Lumber Co.* v. *Moore*, 183 Cal. 497 [11 A. L. R. 549, 191 Pac. 905], a contract of guaranty signed by the secretary by verbal direction of the president and business manager of the corporation was held binding.

In *Arnold* v. *La Belle Oil Co.*, 47 Cal. App. 290 [190 Pac. 815], which was an action involving a broker's claim for commissions, it was held on the authority of *McCartney* v. *Clover V. L. Co.*, 232 Fed. 697 [1 A. L. R. 1127, 146

C. C. A. 623], construing section 2309 of our Civil Code, that executive officers are not merely agents but are the true bodily representatives of the corporation and, hence, may bind it without having express written authority.

That either a *de jure* or *de facto* general manager is such an executive officer is established beyond cavil by the cases already cited.

For present purposes, however, the most apt citation is, perhaps, *Pacific Impt. Co.* v. *Jones,* 164 Cal. 260 [128 Pac. 404], where one of the defendants here was suing as plaintiff to recover rent for the Arcadia Hotel, at Santa Monica, under a lease purporting on its face to be that of the Pacific Improvement Co., but signed individually by A. D. Shepard (who was shown in the evidence here to have been Morse's predecessor as general manager). The objection was raised by the defendant Jones that Shepard as an individual was a stranger to the lease, and, further, was not shown to have had written authority from the Pacific Improvement Co. The company suing had judgment for the rent, and on appeal the supreme court said (164 Cal. 263 [128 Pac. 406]) : "The circumstances in evidence thus conclusively show that Shepard in attaching his signature to the paper did so for and on behalf of the corporation whose general manager he was and that defendant was fully cognizant that he so acted. The document was shown to be that of the corporation."

It is idle to pursue the discussion. Morse as formally constituted general manager of the Pacific Improvement Co. and as *de facto* manager of the Oakland Water Front Company had full power to engage plaintiff in writing.

We come now to a consideration of the second count of the complaint, cast in the form of *indebitatus assumpsit.*

It is contended that there is no sufficient statement of a cause of action in the second count, in that the averment is merely of an indebtedness of $30,000 for plaintiff's services performed at defendants' request, without any statement that the amount represents either the reasonable value or the sum agreed.

The count is predicated on the theory that the defendants prevented complete performance of the contract of June 21, 1917.

[11]    A state of facts showing prevention of performance justifies an action in *assumpsit,* and while the broker's contract cannot be set up to defeat the implied *assumpsit,* it is admissible in evidence to show how the cause arose and to supply a measure of damages. (*Breen* v. *Roy,* 8 Cal. App. 475 [97 Pac. 170]; *Boyd* v. *Bargagliotti,* 12 Cal. App. 228 [107 Pac. 150]; *Reynolds* v. *Jourdan,* 6 Cal. 108; 5 C. J. 1388, sec. 20.)

[12]    The evidence here justified the plaintiff as a precautionary measure in going to the jury on a count based on the theory of prevention of performance. The price had been named to Robinson by plaintiff and confirmed by Morse in March, 1918. Soon thereafter Christy made a counter-offer to Hammond, against the acceptance of which plaintiff advised. Then came the ugly days of the war between March 21st and April 1st, succeeded by the announcement of the government's change of policy and its intention to speed the transport of troops. And on the heels of these occurrences, and when the extension of existing shipyards was seen to be immediately impending, supervened the defendants' letter of April 3d, which, instead of giving plaintiff the prescribed notice of one month, declared that the arrangement in the letter of June 21, 1917, "is terminated." Then followed in May Powell's hurried visit, with the dealings thereat kept secret from plaintiff and plaintiff's efficient preparatory work made almost instantaneously to redound to the benefit of defendants.

[13]    It was not essential to aver that the sum demanded was the reasonable value of the service. (*Abadie* v. *Carrillo,* 32 Cal. 172; *Wilkins* v. *Stidger,* 22 Cal. 231 [83 Am. Dec. 64]; *Jan Wai* v. *Smith-Riddell Co.,* 55 Cal. App. 59 [202 Pac. 952].)

It follows that the general demurrer was properly overruled; and there was no special demurrer to the second count.

[14]    Nor was plaintiff required to offer any evidence concerning the amount of damages other than the contract itself on which he was entitled to rely as a standard of value. Defendants had the opportunity to introduce countervailing evidence, but there was no attempt to proffer any. The rules applicable in such cases are declared in

*Blumenthal* v. *Goodall,* 89 Cal. 251 [26 Pac. 906]; *Alderson* v. *Houston,* 154 Cal. 1 [96 Pac. 884]; *Realty B. & F. Co.* v. *Pt. Richmond C. & L. Co.,* 171 Cal. 238 [152 Pac. 433]. See, also, *Burchell* v. *Gourie etc. Collieries* [1910], L. R. App. Cas. 614, 626.

[15]   The plaintiff was under no compulsion to elect between his two counts. He was entitled to submit his entire case to the jury for determination upon the facts, and it was the province of the jury to decide which count was supported by the evidence. (*Tanforan* v. *Tanforan,* 173 Cal. 270, 274 [159 Pac. 709]; *Estrella V. Co.* v. *Butler,* 125 Cal. 232, 234 [57 Pac. 980]; *Van Lue* v. *Wahrlich etc. Co.,* 12 Cal. App. 749 [108 Pac. 717].)

[16]   The jury rendered a general verdict; and if the evidence adduced on the whole case supports a verdict on either count, the verdict and the judgment entered thereon must stand. (*Merrill* v. *Kohlberg,* 29 Cal. App. 382, 384 [155 Pac. 824]; *Schudel* v. *Helbing,* 26 Cal. App. 410, 412 [147 Pac. 89]; *Estate of Hellier,* 169 Cal. 77, 83 [145 Pac. 1008]; *Verdelli* v. *Grays Harbor Co.,* 115 Cal. 517, 525 [47 Pac. 364, 778]; *Crosett* v. *Whelan,* 44 Cal. 200, 203.)

[17]   It is finally urged, however, by counsel for defendants that all possible right to his commission was forfeited by plaintiff when he took employment with the government's engineers. Their theory is that this service involved duties possibly adverse to the interest of defendants as sellers, in that information of subsurface conditions imparted by plaintiff might have disclosed disadvantageous as well as advantageous attributes of the property.

The contention is without merit. At Robinson's request plaintiff met the engineers on certain occasions in June, and with them and Robinson he spent several hours in examining the tract and explaining the character and extent of the reclamation work. It was after this that the Fleet Corporation took the formal option dated July 1, 1918; and it was not until about the middle of July that plaintiff accepted employment from the engineers to aid in the reclamation and, as "ancient historian," to advise in engineering problems. There was in this no double-dealing on plaintiff's part, and his employment involved

no service in conflict with a due regard to the interests of the defendants. The employment continued about three months, and the sale was closed by the Fleet Corporation before plaintiff's employment ceased. Though the option ran for sixty days from July 1st, the Fleet Corporation declared its election on July 31st.

It would thus appear that plaintiff's assistance furthered rather than dissuaded action, and there is nothing in the evidence to indicate the slightest breach of plaintiff's duty. On the contrary, he seems at all times to have been zealous in advancing the true interests of defendants. And in justice to defendants it should be said that there is nothing on their part suggestive of even a remote desire to conceal anything affecting the suitability of the property for the intended use.

If there were known disadvantages of which the government had not been apprised, then fairness and good faith counseled full disclosure. At no time can a broker with a due sense of the ethics of his calling justify himself in deliberately withholding from a purchaser material facts known to the broker and not known or visible to the purchaser; nor would he rightly serve his principal in so doing. There is no breach of trust toward his employer in revealing the truth, and the law will not penalize commendable candor by forfeiting the broker's commission. The broker is employed to deal honestly. Evidence of "honesty, truthfulness, and good reputation" is a prerequisite to the issuance of a real estate license, and dishonest dealing furnishes a ground for revocation of a license. Willful concealment or suppression of material facts is sheer dishonesty; and every broker owes it to the seller as well as to the buyer, and none the less to himself, to oppose and shun everything smacking of fraud, sharp practice, or bad faith.

It is fitting to add that in the record before us there is nothing whatever impugning the good faith of anyone in the negotiations with either the Bethlehem Shipbuilding Corporation or the Emergency Fleet Corporation.

[18] It remains but to speak of defendants' exceptions to certain instructions given and to the refusal to give others proposed. The discussion already had renders a brief reference sufficient.

Defendants complain of the refusal to give a set of proposed instructions which were framed on the theory that no acts done by the plaintiff after April 3d, or at most more than thirty days thereafter, could be considered by the jury, and that defendants were not liable for anything done by plaintiff if it had not reached the knowledge of, or commenced its influence on, the Fleet Corporation within thirty days after April 3d at the latest; and that plaintiff could base no claim on any negotiations had with the Bethlehem Shipbuilding Corporation which led that company, without request from plaintiff, to impart information to the Fleet Corporation with the result that the latter became the purchaser.

The instructions which the court did give were to the effect that the jurors should confine their attention to the acts and negotiations of plaintiff prior to April 3d, and if those acts were found to be the procuring cause of the sale, then plaintiff was entitled to recover, though the sale was actually effected under the circumstances shown in the evidence more than thirty days after April 3d, and was made to the Fleet Corporation without direct contact between it and plaintiff.

For reasons already stated, we hold that the instructions requested were properly refused, and that in those given on the subject there was no prejudice to defendants.

Other instructions requested purported to define the terms used in the contract, and were designed to declare to the jury that a sale could not be held to have originated with plaintiff, or to have been made through his negotiations or efforts because, after he had brought the matter to the attention of the Bethlehem Shipbuilding Corporation, its officers then, without request from him, imparted the information to the Fleet Corporation and influenced it to buy. The evidence was not of a character to give a foundation for such instructions, and the refusal was therefore justified.

In the same connection complaint is made that in defining the meaning of the words used in the contract, the court used the phrase "may be construed as meaning," without positively declaring the meaning. That is a stricture directed at form rather than substance, and needs no further comment.

So, also, criticism is directed to language stating that a verdict might be given in plaintiff's favor, if the sale resulted from negotiations conducted by him "in pursuance of said letter of June 21st, 1917," without specifying in that particular instruction what would constitute service pursuant to the letter. But the court elsewhere set forth quite fully what in the way of performance was demanded of plaintiff as a basis of recovery.

In respect of the second count, the defendants complain because the instruction given on the subject of prevention of performance left it to the jury to determine whether the letter of April 3d was executed in bad faith, in order to prevent plaintiff from bringing about a sale then in course of completion and so to deprive plaintiff of his commission. It is insisted that there was no evidence justifying an instruction on the subject. Our views regarding this matter have already been expressed; and we believe that the occasion did furnish good reason for the court's action.

It is also urged that it was error to refuse to instruct that the plaintiff could not recover without proof by him of full performance, and that the contract itself was not evidence of value. This instruction also was properly refused.

Error is further charged in the refusal of the court to give an instruction that plaintiff could not recover if his employment by the government engineers placed him under duty to disclose the true conditions of the land, unfavorable as well as favorable. There is no breach of trust in disclosing true conditions, and the evidence afforded no justification for the instruction requested.

On the subject of the legal sufficiency of the contract, it would have been error to adopt the instruction proposed by defendants to the effect that the contract was obnoxious to the statute of frauds.

The instructions read as a whole gave an exposition of the law which subjected defendants to no prejudice, and placed the case before the jury in a manner which left to the defendants no just ground of complaint.

Viewing the case in its entirety, we conclude that plaintiff was both legally and morally entitled to the compensation awarded him. It was through him as the moving cause that the interest which induced the purchase was

awakened and sustained without break in continuity until the final consummation. He it was who shook the tree, and it would be a miscarriage of justice if he were to be deprived of the fruit of his labor.

The judgment is affirmed.

Langdon, P. J., and Sturtevant, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on April 8, 1922, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 9, 1922.

All the Justices concurred.

Waste, J., was absent and Richards, J., *pro tem.*, was acting.